UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

**JOSE DIAZ,**

                                   **Plaintiff,**

                           -v-                               1:12-CV-1327 (NAM/TWD)

**GLOBALFOUNDRIES, U.S., INC. and M + W
U.S., INC.,**

                                  **Defendants.**

✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

APPEARANCES:

Bennett, Giuliano, McDonnell & Perrone, LLP
Matthew M. Gorden, Esq., of counsel
Nicholas P. Giuliano, Esq., of counsel
494 Eighth Avenue - 7th Floor
New York, New York 10001
Attorneys for Plaintiff

Hiscock & Barclay, LLP
David M. Cost, Esq., of counsel
Thomas J. O'Connor, Esq., of counsel
80 State Street
Albany, New York 12207
Attorneys for Defendants

**Hon. Norman A. Mordue, Senior U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### INTRODUCTION

Plaintiff moves (Dkt. No. 24) for partial summary judgment on the issue of liability in this

diversity action based on section 240(1) of New York State Labor Law.[1] Defendants move (Dkt.

---

[1] By stipulation and order filed September 27, 2013 (Dkt. No. 23), plaintiff's claims under New York State Labor Law §§ 200 and 241(6) and for common law negligence were discontinued against all defendants on the merits, with prejudice.

No. 25) for summary judgment dismissing the action in its entirety. As set forth below, the Court denies plaintiff's motion, grants defendants' motion, and dismisses the case.

## FACTS

In this action based on an injury sustained while he was working at a construction site, plaintiff claims that he is entitled to the benefit of section 240(1) of the New York Labor Law. Section 240(1) imposes strict liability on building owners and contractors for injury to a worker caused by the failure to provide proper protection against an elevation-related hazard. *See Wilinski v. 334 East 92nd Housing Development*, 18 N.Y.3d 1, 7 (2011).

The determinative facts regarding the accident are undisputed. Plaintiff, a sheet metal worker, injured his left shoulder on October 6, 2010, while working in the FAB 8.1 building at a factory then under construction in Malta, New York. For purposes of this motion, Globalfoundries U.S. Inc. stipulates that it is the owner of the jobsite, and M + W U.S., Inc. stipulates that it is the general contractor on the project. Plaintiff was employed by Kleeberg Tougher, which contracted with M + W U.S., Inc. to install the HVAC system in the FAB 8.1 building, including the installation of ductwork. At the time of the accident, plaintiff was working on a branch of the ductwork that was approximately 16 feet off the floor. Plaintiff's affidavit in support of his summary judgment motion states:

> 12. On October 6, 2010, I was instructed by my foreman, Bob White, to install a ventilation door or cap ("door") on a branch coming off the main ventilation duct. The branch had a diameter of about 30 inches. The door was to function as a temporary cap on the branch to allow Kleeberg to test the system.
> 13. At Fab 8, installing the door was a three man job that also required two ladders and a pulley system.
> 14. When three workers performed the job at Fab 8, two extension ladders were set up parallel to each other about 6 feet apart. The ladder tops rested against the main ventilation duct. One ladder was on the right side of the

-2-

branch and the other on the left side of the branch. Two workers ascended the ladders while one remained on the floor and used a rope and pulley system to hoist the door up to the two workers on the ladders. As the door was hoisted near the branch to be capped, the two workers on the ladders guided it into position and then secured it into place using bolts and torque wrenches.

15. At other job sites, we did this work with two men, but we used a chain block or equipment lift instead of a rope and pulley. When a chain block or equipment lift is used, the door can be raised into position above the floor and held in place by the chain block or lift. When a rope and pulley system is used, the rope must be held by a third worker on the floor to keep the door from falling to the ground.

16. On October 6, 2010, there were not enough workers or gear to do the job. My foreman told me to work with him. We did not have a third worker, a pulley, a chain block, or an equipment lift. I questioned whether we could do the job without a pulley or third worker. My foreman said we could.

17. The foreman told me to climb the ladder and raise the door to the duct.

18. I used a vise grip and clamp to attach a rope to the door, went up the ladder and then hoisted the door up from the floor to the ventilation duct using the rope.

19. My foreman became distracted by other work and did not ascend the other ladder that was set up near mine.

20. I hoisted the door from the floor to the ventilation duct, a distance of no less than 16 feet.

21. As the door got near the branch to be capped, I called to my foreman to help install the door on the branch opening, but my foreman was not there.

22. While holding the rope with my left hand, I attempted to maneuver the door into position on the opening in the branch.

23. Because of the weight of the door, the absence of the pulley system, chain block, or equipment lift, I could not hold the door in position and secure it in place.

24. The door weighed at least 30 pounds and I was holding it on the right side of the ladder using my left hand, so I was reaching across my chest.

25. I felt pain in my left shoulder and could not continue to hold the door, so I transferred the load to my right hand. I could not drop the door because I could not see below and did not want to hurt anyone. Then, using my right hand and arm, I lowered the door to the floor.

26. Immediately prior [to] lowering the door, the door was not secured or not sufficiently secured to prevent it from falling.

27. At the time of the incident, no device was utilized to prevent the door from falling or to hold it in place or to allow me to perform my job safely.

28. When I descended to the floor, I immediately advised my foreman of the incident.

\*\*\*

31. On November 11, 20l0, I had an MRI of my left shoulder.

32. I believe the MRI indicated that I tore my rotator cuff.
33. On July 11, 2013, l underwent shoulder surgery and I am now going to physical therapy.

At his deposition, plaintiff testified as follows:

> Q On this day, it was just you and Mr White, correct?
> A Correct.
> \*\*\*
> A [White] was on the floor. He instruct me. Jose, take the rope. Go up there and start pulling. I meet you up there. We could do this. It happens I couldn't see him because the branches and I'm standing right here.
> Q On your right-hand side?
> A The guy supposed to come up here. I'm in an awkward position. The ladder was leaning against the big trunk. I'm trying to pull, holding on the top branch, pulling two hands. When I get closer, I notice I'm a little jammed underneath because I'm against it. I call. He is not there. I don't want to drop. I can't see what's below. When I'm pulling I don't have to see what I'm pulling and I figure he's coming up with me. So I try to bring it over to put a pin to hold it there for a minute, because the weight was tremendous and he was not there. So when I try to pin it, that's when I felt the [pain].
> \*\*\*
> Q Mr. Diaz, you said you went up the ladder and you said you were pulling up this cap. Was that just pulling up the rope with your left arm?
> A Not exactly.
> Q How did you pull up the rope is my question?
> A I took the rope upstairs. I took it to the center of the opening which is about 30 inches. I put my hand on top of that. I hold the rope here. I pull it, his one. I grab the other one. Okay. At the time I got close, I need to bring it up to put it to lock it up in place because I expected him to be here. I didn't have ... the strength. Within a minute, I was losing it. Either I drop it or – I tried to hold it from dropping it so.
> \*\*\*
> Q What I understand is that you were holding part of the rope with your right arm as you drew it up with your left arm?
> A No, holding up with the left arm while pulling with the right.
> Q Holding the tension of the rope with your left arm as you are pulling it up with the right?
> A Yes.
> Q When you got it to the top, you went to move it into place?
> A Move it away from the cap to bring it up over to get it closer.
> Q When you lifted it, that's [when] you felt the pain?
> A Yes.
> Q You felt the pain. Then you had to lower it to the floor?

> A I hold it with my right arm and let it go down.
> ***
> A ... The access door, the door we were bringing up, was caught on the bottom of the whole radius. I was raising the rope against it. I needed to get it away from it in order to bring it up higher to clear when I'm getting caught. That's actually when it.
> Q That's when you felt the pain?
> A Yes.
> Q At that point, can you estimate how far the door was from the opening?
> A Approximately the same size of the opening, about 30 inches.
> Q Your hands, were they right in front of the opening at this point?
> A Repeat that.
> Q Your hands, I understand the door was 30 inches below. Were hands right in front of the opening?
> A No, above the opening.
> Q How far were they above the opening?
> A At the time of the accident?
> Q Yes.
> A It was higher than the opening, a little bit higher.
> Q Can you approximate how much higher?
> A Eight or 12 inches.
> Q How much did the cap weigh in your estimation or the door, sorry?
> A Between 30 pounds or more.
> ***
> Q After you lowered the door to the ground, did you climb down the ladder?
> A. Yes, I managed to come down.
> Q When you were on the ladder, nothing fell on you, right?
> A No.
> Q When you were on the ground, nothing fell on you, right?
> A No.

In his response (Dkt. No. 33) to defendants' Statement of Material Facts (Dkt. No. 28), plaintiff admitted that "when the door reached him he attempted to move it in place as it was caught below the bottom of the ductwork. In an awkward position, he pulled it out from beneath the branch of the ductwork and attempted to lift it into place." (Citations to record omitted.) Plaintiff added that he "felt pain when he tried to free the door from being stuck underneath the branch opening."

**DISCUSSION**

-5-

Summary judgment is appropriate when there is no genuine issue with regard to any material fact, and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Stated otherwise, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). When deciding a summary judgment motion, the Court must "resolve all ambiguities and draw all factual inferences in favor of the party opposing the motion." *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999).

In this diversity case, the Court applies New York State substantive law. The dispute on the instant motions centers on whether plaintiff is entitled to recover under section 240(1) of the New York State Labor Law. Section 240(1) provides:

> All contractors and owners and their agents, ... in the erection, demolition, repairing, altering, painting, cleaning or pointing of a building or structure shall furnish or erect, or cause to be furnished or erected for the performance of such labor, scaffolding, hoists, stays, ladders, slings, hangers, blocks, pulleys, braces, irons, ropes, and other devices which shall be so constructed, placed and operated as to give proper protection to a person so employed.

Section 240 "imposes absolute liability on building owners and contractors whose failure to provide proper protection to workers employed on a construction site proximately causes injury to a worker." *Wilinski*, 18 N.Y.3d at 7 (citation and quotation marks omitted). "Whether a plaintiff is entitled to recovery under Labor Law § 240(1) requires a determination of whether the injury sustained is the type of elevation-related hazard to which the statute applies." *Id.* (citing *Rocovich v. Consolidated Edison Co.*, 78 N.Y.2d 509, 513 (1991).

New York courts have long applied a "falling worker or falling object" standard in evaluating whether a case falls within the reach of section 240(1). *See, e.g., Ross v. Curtis-*

*Palmer Hydro-Elec. Co.*, 81 N.Y.2d 494, 501 (1993) (stating that the reach of Labor Law § 240(1) is "limited to such specific gravity-related accidents as falling from a height or being struck by a falling object that was improperly hoisted or inadequately secured."). In *Runner v. New York Stock Exchange, Inc.*, 13 N.Y.3d 599 (2009), the Court of Appeals elaborated upon this standard, holding that liability for injury caused by a falling object does not "depend upon whether the object has hit the worker." *Id*. at 604.[2] Rather, "[t]he relevant inquiry – one which may be answered in the affirmative even in situations where the object does not fall on the worker – is ... whether the harm flows directly from the application of the force of gravity to the object." *Id.*

Plaintiff in the case at bar relies heavily on the *Runner* decision. The facts in *Runner* are as follows:

> Plaintiff and several coworkers had been directed to move a large reel of wire, weighing some 800 pounds, down a set of about four stairs. To prevent the reel from rolling freely down the flight and causing damage, the workers were instructed to tie one end of a 10-foot length of rope to the reel and then to wrap the rope around a metal bar placed horizontally across a door jamb on the same level as the reel. The loose end of the rope was then held by plaintiff and two coworkers while two other coworkers began to push the reel down the stairs. As the reel descended, it pulled plaintiff and his fellow workers, who were essentially acting as counterweights, toward the metal bar. The expedient of wrapping the rope around the bar proved ineffective to regulate the rate of the reel's descent and plaintiff was drawn horizontally into the bar, injuring his hands as they jammed against it.

*Id*. at 602. In addressing these facts, the *Runner* court acknowledged that it had previously characterized the "special hazards" covered by section 240(1) as "'falling worker' and 'falling

---

[2] The New York Court of Appeals decided *Runner v. New York Stock Exchange, Inc*., 13 N.Y.3d 599 (2009), in response to questions certified by the Second Circuit. *See Runner v. New York Stock Exchange, Inc.*, 568 F.3d 383 (2nd Cir. 2009), *certifying questions*; 12 N.Y.3d 892 (2009), *accepting certified questions*; 13 N.Y.3d 599 (2009), *answering certified questions*; 590 F.3d 904 (2d Cir. 2010), *conforming to answer to certified questions.*

object' cases," and as "limited to such specific gravity-related accidents as falling from a height or being struck by a falling object that was improperly hoisted or inadequately secured." *Id.* at 604 (quoting *Narducci v. Manhasset Bay Assoc.*, 96 N.Y.2d 259, 267 (2001), and *Ross v. Curtis-Palmer Hydro-Elec. Co.*, 81 N.Y.2d 494, 501 (1993)). The *Runner* court continued:

> But in referring to these familiar scenarios in which section 240(1) liability may arise, neither [*Narducci* nor *Ross*] purports exhaustively to define the statute's protective reach. Rather, the governing rule is to be found in the language from *Ross* following closely upon that just quoted, where we elaborated more generally that "Labor Law § 240(1) was designed to prevent those types of accidents in which the scaffold, hoist, stay, ladder or other protective device proved inadequate to shield the injured worker **from harm directly flowing from the application of the force of gravity to an object or person** (*Ross*, 81 N.Y.2d at 501...).

*Id.* (emphasis in *Ross*). In determining that the plaintiff in *Runner* was entitled to recover under section 240(1), the *Runner* court provided the following analysis:

> Manifestly, the applicability of the statute in a falling object case such as the one before us does not under this essential formulation depend upon whether the object has hit the worker. The relevant inquiry – one which may be answered in the affirmative even in situations where the object does not fall on the worker – is rather whether the harm flows directly from the application of the force of gravity to the object. Here, as the District Court correctly found, the harm to plaintiff was the direct consequence of the application of the force of gravity to the reel. Indeed, the injury to plaintiff was every bit as direct a consequence of the descent of the reel as would have been an injury to a worker positioned in the descending reel's path. The latter worker would certainly be entitled to recover under section 240(1) and there appears no sensible basis to deny plaintiff the same legal recourse.
> \*\*\*
> The elevation differential here involved cannot be viewed as *de minimis*, particularly given the weight of the object and the amount of force it was capable of generating, even over the course of a relatively short descent. And, the causal connection between the object's inadequately regulated descent and plaintiff's injury was, as noted, unmediated – or, demonstrably, at least as unmediated as it would have been had plaintiff been situated paradigmatically at the rope's opposite end.

*Id*. at 604-05.

Plaintiff argues:

> The instant matter is very similar to *Runner*. In both cases, a pulley system should have been used and, in both cases, the failure to do so caused injury to the plaintiff. In both cases, the workers jerry-rigged a simple rope in lieu of a pulley system, which failed to perform its intended function.

Thus, plaintiff contends, his injuries, like those in *Runner*, were the direct consequence of a failure to provide adequate protection against a risk arising from a significant elevation differential.

This Court reads *Runner* differently. It is true that *Runner* made clear that section 240(1) liability may arise even where the object does not actually strike the plaintiff. *Runner* did not, however, as this Court reads it, hold that such liability may arise where the object does not fall or descend. In holding that the plaintiff's injuries were sufficiently elevation-related to satisfy section 240(1), the *Runner* court defined the relevant inquiry as "whether the harm flows directly from the application of the force of gravity to the object." The *Runner* court answered the question in the affirmative, citing to "the weight of the object and the amount of force it was capable of generating, even over the course of a relatively short descent." *Id*. at 605; *accord Wilinski*, 18 N.Y.3d at 10. Thus, the *Runner* court treated the term "force of gravity" as meaning the force generated by the interaction between the weight of the object and its descent. *See also Strangio v. Sevenson Env. Servs.*, 15 N.Y.3d 914, 915 (2010) (reinstating section 240(1) claim where plaintiff was struck in face by handle of scaffold hoist during scaffold's unchecked descent), *modifying* 905 N.Y.S.2d 729 (4th Dep't 2010). The *Runner* court added that "the injury to plaintiff was every bit as direct a consequence of the descent of the reel as would have been an injury to a worker positioned in the descending reel's path." Implicit in the *Runner* decision, therefore, is the assumption that the risk that must be protected against is the uncontrolled or

-9-

inadequately controlled fall or descent of an object. Indeed, the *Runner* court itself referred to the case before it as a "falling object case," which it plainly is. *Id.* at 604.

This Court does not read *Runner* as extending section 240(1)'s protection to a worker, such as plaintiff in the instant case, who is injured by the ordinary operation of gravity while lifting a heavy object. *See Ross*, 81 N.Y.2d at 501 (stating that the "special hazards" covered by section 240(1) "do not encompass any and all perils that may be connected in some tangential way with the effects of gravity."). Because *Runner* cannot properly be read to eliminate the element of a fall or descent, it does not support recovery under section 240(1) for an injury occurring when a worker attempts to lift an inert weight. The Court concludes that plaintiff is not aided by the fact that he had raised the duct door from a lower level to an elevated height; because there was no fall or descent, his injury did not "directly flow[] from the application of the force of gravity to an object or person" within the meaning of *Runner* and other New York high court authority. *Runner*, 13 N.Y.3d at 604 (quoting *Ross*, 81 N.Y.2d at 501); *see Wilinski*, 18 N.Y.3d at 10.

The Court finds no genuine issue with regard to any material fact. Defendants are entitled to judgment as a matter of law. Based on this holding, the Court does not reach the other issues raised on the motions.

## CONCLUSION

It is therefore

ORDERED that plaintiff's motion (Dkt. No. 24) for partial summary judgment on the issue of liability is denied; and it is further

ORDERED that defendants' motion (Dkt. No. 25) for summary judgment dismissing the action is granted. The Clerk shall enter judgment accordingly.

IT IS SO ORDERED.

Date: August 1, 2014
Syracuse, New York

_Norman A. Mordue_
Norman A. Mordue
Senior U.S. District Judge